### Susan Maynes v. George W. Veale, *et al.*

POTTAWATOMIE INDIAN LANDS; *Indian Owner; Alienation; Occupying-Claimant Act.* An Indian owner of land, held under treaty stipulations which provide that the land shall be exempt from levy, taxation, or sale, and shall be alienable in fee, or leased, or otherwise disposed of *only* to the United States, or to persons then being members of the Pottawatomie tribe and of Indian blood, with the permission of the President, and under such regulations as the Secretary of the Interior shall direct, cannot be compelled to pay for improvements on the premises under the occupying-claimant act.

### *Error from Shawnee District Court.*

EJECTMENT, brought by *Susan Maynes*, a Pottawatomie Indian woman, to recover eighty acres of land allotted to her under the Pottawatomie Treaty of 15th November 1861.* The land was subsequently patented to one Anthony F. Navarre, under the supposed authority of the Treaty of 27th February 1867.† Navarre and wife, 25th June 1870, conveyed the land, by deed, to *George W. Veale*. Afterward, *Veale* and wife conveyed different portions of the land to A. C. Sherman, Jesse Coover, and T. W. Meserve, respectively;

---

*THIS Treaty was proclaimed by the President on the 19th of April 1862, and is spoken of, indiscriminately, as, "Treaty of 1861," and "Treaty of 1862."

†THIS Treaty was amended on the 4th of August 1868, and ratified by the Senate and proclaimed by the President on the 7th of August 1868, and is spoken of, indiscriminately, as, "Treaty of 1867," and "Treaty of 1868."

and said grantees severally conveyed or incumbered some portions of the land to various other parties. There are twenty-five defendants named in the pleadings, besides *Veale*, all of whom claimed title under *Veale*, or his grantees, or were in possession as tenants, holding under such grantees. The plaintiff, *Maynes*, claimed as owner in fee under the allotment to her, and the certificate issued to her as such allottee by the Commissioner of Indian Affairs. The defendants filed an answer denying plaintiff's title. The second trial was had at the April Term 1876 of the district court. Findings and judgment in favor of the plaintiff. These findings and judgment are set forth in full in the opinion, *infra*. Final judgment being entered in favor of the plaintiff for the recovery of the land, the defendants, at said April Term, made their application under the 25th article of the civil code, "for the valuation of their lasting and valuable improvements upon said land;" and the district court, upon consideration thereof, held and decided "that said defendants are entitled to the benefit of the provisions" of said article 25th, and amendments thereto, as occupying claimants, and made an order for the usual and proper proceedings for the ascertainment of the value of said lasting and valuable improvements. To this order the plaintiff excepted, and now brings the record here for review.

*Hayden & Hayden*, for plaintiff:

The issuance of the certificate allotment under the treaty of 1862, operated as a *grant* to the allottee, and the patent subsequently issued to Navarre is void. 23 How. 457; 1 Black, 352; 19 Wis. 173; 1 Doug. (Mich.) 546; 4 Mich. 565. If the allotment to the plaintiff constituted a grant of the land to her, it must follow that no subsequent legislation could divest her of the title thereto, or authorize the issuance of a patent therefor to another. *Stevens v. Smith*, 2 Kas. 243, 250. We suppose it will not be denied, that if the only title by which the land is now held is that which is vested in the plaintiff by virtue of her certificate of allotment,

issued under the provisions of treaty of 1862, that the restrictions upon the right of alienation therein contained must be upheld by the courts. 2 Kas. 243; 5 Kas. 578; 3 Kas. 299, 354; 4 McLean, 82; 12 Kas. 335; 29 Wis. 383, 390; 3 Ind. 494; 20 Miss. 425.

Then if the plaintiff's title is inalienable, except upon the terms and conditions and in the manner provided by article 2 of the treaty of 1862, we think it must follow that the occupying-claimant act, (article 25th of the civil code, and amendments,) when applied to the facts as they exist in this case, is in contravention of a paramount federal law, to-wit, the provisions of said article 2. For, suppose (and in this case it is a fact) that the plaintiff, by reason of her poverty, would be unable to comply with the provisions of § 609 of the occupying-claimant act, by paying the appraised value of the improvements; then, if defendants should pay into court the appraised value of the naked land, as provided by § 611 of the same act, the title to the premises would vest in them; and thus, by operation of the statute of the state, an alienation of the title would be effected, and all the guaranties and protection which the federal law threw around her title would thereby be rendered nugatory. A treaty is parcel of the paramount law, and must prevail over all state laws in conflict with it. This results from the nature of the treaty-making power, and from the paramount authority which the constitution attributes to federal treaties when it declares them to be "the supreme power of the land." A state is therefore precluded from passing any law which shall frustrate a guaranty afforded to Indians by treaty. 23 N. Y. 420, 427; 3 Dal. 199; 6 Pet. 515; 29 Wis. 383, 390; 3 Dillon Ct. Ct. R. 418. We submit therefore, that if the restrictions upon the right of alienation of the land in controversy, as provided by article 2 of the treaty of 1862, are still in force, that neither the legislature nor the courts can make a sale or transfer of title for the plaintiff which she herself could not make. 12 Kas. 335; 5 Wall. 737.

What we have said thus far is upon the hypothesis that plaintiff would be unwilling to either pay the amount which might be allowed to defendants as the value of their improvements, or to accept the value of the naked land. Suppose, on the other hand, that plaintiff might be willing to accept the appraised value of the naked land, and defendants were unwilling to pay for it. Plaintiff could only enforce payment by first tendering to them a general warranty deed, conveying her title to them, as required by § 610 of the code. But if these treaty restrictions upon her right of alienation are still in force, she could not comply with this requirement of the code, even if willing to do so, *unless the defendants are members of the Pottawatomie tribe, and of Indian blood,* and unless she could also obtain the consent of the president to such conveyance. In any light, therefore, in which we may view the occupying-claimant act, its provisions, if applied to the existing facts in this case, seem to be in conflict with the paramount federal law.

It may be argued by defendants, that the restrictions upon the right of alienation provided by the treaty of 1862 were afterward removed by virtue of the pretended proceedings had pursuant to article 3 of the treaty of 1862, which provides that upon the issuance of the patents "the lands so patented to them shall thereafter be subject to levy, taxation and sale, in like manner with the property of other citizens." But this provision evidently applies only to lands for which patents have been *legally* issued, and cannot be construed to apply to lands for which patents have been issued without authority of law. 5 Kas. 578, 585. But even if there were no restrictions upon plaintiff's right of alienation, still as her title and right of possession are secured by a treaty with the United States, under which the land in controversy was "assigned and set apart for the perpetual and exclusive use and benefit" of plaintiff and her heirs, we submit, that state legislation cannot disturb her in the rights thus secured and guaranteed to her by the paramount law of the land. 12 Kas. 335, 340.

25 — 20 KAS.

Maynes v. Veale.

*Peck, Ryan & Johnson,* for defendants:

1. Judgment of eviction having been rendered against the defendants, they invoked the benefits of the occupying-claimant act. They were in possession of the premises in controversy, claiming title under the *patentee,* who, as head of the family to which plaintiff belongs, received the patent for her allotment as provided by § 6 of the treaty of February 27th 1867. The defendants come squarely within the terms of § 601 of the civil code, both in its letter and spirit. Is there anything in the condition of the land, or the status of the plaintiff, which prevents the operation of the statute, and turns the defendants out of possession without compensation for the improvements which they have made in good faith? A conclusion so unjust and inequitable ought not to be reached until the most careful scrutiny of the law, and deliberation as to its meaning, leave no other construction possible. The occupying-claimant act is one favored by the courts. Its wise and humane provisions receive a liberal construction. It has provided that the harsh judgment of the law shall not be carried into execution until the victorious party has done justice to the defeated one. It does not matter that the patent under which the defendants claim is void. If it was valid, there would be no occasion for asking the benefits of the occupying-claimant act. Only those who are sick need a physician.

Under the rule laid down by this court in *Smith v. Smith,* 15 Kas. 290, it is not necessary, as yet, to inquire whether the court below erred in holding the patent to the head of the family void. But it is argued, that the plaintiff's title is such, and such only, as is conferred by article 2 of the treaty of 1861; that such title is inalienable, and therefore not subject to the provisions of the occupying-claimant act. We do not think the allottee's title, after patent has been issued to the head of the family, is inalienable. The treaty of 1861, in the 2d article, places restrictions upon the right of the allottees to convey. Article 3d provides for the removal of

such restrictions as to "adults, being males and heads of families," upon certain conditions and regulations mentioned in the article. These conditions and regulations are preliminary to the issuance of patents to the allottees and termination of their tribal relations. They then become citizens, and their lands become alienable. The court will observe that by the section we are now discussing only "adults, being males and heads of families," could become citizens. Afterward, by a supplemental article, it was provided that the privilege should be extended to all adults, without distinction of sex, and whether the person was the head of a family or not. (14 U. S. Stat. at Large, 763.) Still another step in the direction of emancipation from the restrictions of the treaty of 1862 was taken by the adoption of article 6 of the treaty of 1867. (15 U. S. Stat. at Large, 531.) This article provides that, "where any member of the tribe shall become a citizen under the provisions of the said treaty of 1862, the *families* of said parties shall be considered as citizens, and the head of the family shall be entitled to patents, and the proportional share of funds belonging to his family." Under this article, the patent in the present case was issued to Navarre, the head of the family of which plaintiff was a member. The patent could not issue to Navarre until he became a citizen. When he became a citizen, his family became citizens. So, that whether as a matter of law the patent could rightfully issue to Navarre for the land allotted to the plaintiff or not, it is clear that she is a citizen of the United States, and not a member of the Pottawatomie tribe. The provision that the members of the family shall become citizens when the head of the family becomes one, is clear and explicit, and must stand, whatever may be the proper construction of the remaining provision relative to the issuing of patents.

The court will notice that we have mentioned three different articles in as many different treaties, all relating to this question of citizenship, and the emancipation of allottees from the restrictions of the treaty of 1862. They are—1st, Article 3 of the treaty of 1862, (12 U. S. Stat. at Large, 1191;)

2d, The supplemental article, (14 Stat. at Large, 763;) 3d, Article 6 of the treaty of 1867, (15 Stat. at Large, 531.) These three articles relate to the same subject, and must be considered together. They all have the same object, viz., to enable allottees to become citizens, and to give them the management of their own affairs. While they remained members of the tribe they could only alien their lands to the United States, or to members of the tribe. But it would be absurd to say, that after they become citizens they can only convey to the United States, or to members of the tribe, for the reason for such a provision has entirely ceased; and article 3 expressly provides that when they become citizens their lands shall become alienable, taxable, etc. The plaintiff having become a citizen, together with the head of her family, she derives the benefit of that change in her political condition, to the same extent that he does.

2. But let us concede, for the purpose of the argument, that the plaintiff's title is inalienable: what effect does that have upon the defendants' right to the benefit of the occupying-claimant act? It is argued that the plaintiff could not convey to the defendants upon payment of the value of the naked land, as provided in § 610 of the code; and that the court could not decree the title to be in the defendants, as provided in § 611. If all this were true, we still think the defendants would be entitled to the benefit of the occupying-claimant act, so far as applicable, and that the restriction upon the plaintiff's right of alienation would simply operate to take from her the privilege of electing whether she would pay for the improvements, or sell the land. She would then be compelled to pay for the improvements before enforcing her judgment of eviction. The defendants — for whose benefit the occupying-claimant act was passed — would lose no rights.

But we lay down the proposition, that under the occupying-claimant act, *as it now stands*, the plaintiff's right to elect has been taken away, and in no case can the occupying claimant take the land. In other words, we claim that the only

provision of the occupying-claimant act now operative, is that which compels the plaintiff to pay for improvements before evicting the defendant. If the court will examine § 601 it will be seen that it absolutely and peremptorily prohibits the eviction of an occupying claimant, until the improvements are paid for, "*unless such occupying claimant shall refuse to pay the person so setting up and proving an adverse and better title, the value of the land without the improvements made thereon, as aforesaid, upon the demand of the successful claimant or his heirs, as hereinafter provided.*" The words italicized modify in a most important particular the former portion of the section. They confer upon the plaintiff the right of compelling the defendant to buy the land, instead of paying for the improvements. Upon these words as a basis, is erected the whole superstructure of the plaintiff's right to elect, whether to buy, or sell. They refer in so many words to the subsequent sections, in the language, "upon the demand of the successful claimant, or his heirs, *as hereinafter provided.*" The "hereinafter provided," refers, of course, to those sections which point out the manner in which the right here conferred may be asserted. Now § 601 has been amended by striking out all the words in italics above, leaving the section unqualified, and ending with the word "effected" in the bottom line of page 749, Gen. Stat. (Laws of 1873, ch. 102.) The legislature could have had but one object in view in so amending the section, and that was to take from the successful claimant the right conferred by the words stricken out. So that, as the law now stands, the defendants cannot be put out of possession in any case until the improvements are paid for. It therefore becomes entirely immaterial whether the plaintiff can convey a good title. The defendant is not bound to accept any deed, but may stand fast and demand the pay for his improvements. Of course, if the rents and profits amount to more than the value of the improvements, the plaintiff would have judgment for the excess; and there being in such case nothing due to the defendant, he could be evicted.

But the intention of the legislature to deprive the plaintiff of his right to elect, is made still more manifest by an examination of § 608.  In this section, as it originally stood, it was distinctly provided that "the successful claimant, or his heirs, they being minors, may, at his or her or their election, either demand of the occupying claimant the value of the land without improvements, so as aforesaid assessed, and tender a deed of the land in question to the occupying claimant, or he, she or they may pay the occupying claimant the sum so allowed by the jurors in his favor, within such reasonable time as the court shall allow."  But the act of 1873 *repeals* this section, and puts in its place another in which there is not the slightest allusion to the doctrine of election, but which provides for a judgment in favor of the occupying claimant, and concludes with the declaration that no writ or process for the eviction shall be issued until the said judgment shall be paid.

The court will notice that section 608 gives the plaintiff the right to elect, 1st, to demand the value of the land; 2d, to pay the value of the improvements.  Sections 609 and 610 simply point out how he shall exercise this privilege of electing.  If he elects to pay, he shall do certain things mentioned in § 609; if he elects to demand the value of the land, he shall do the things mentioned in § 610.  Both these sections draw their life from § 608; and when *that section was repealed,* these necessarily died with it.  It seems too plain for argument that the change in the law was made for the purpose of taking away from the plaintiff the privilege of compelling the defendant to pay for the land.  If it was not made for that purpose, what was it made for? The two sections repealed are the ones which confer that privilege.  The object of repealing them must therefore necessarily have been, to take it away.  Section 611 also goes with the preceding sections as auxiliary to § 608.  It provides for obtaining a decree in favor of the occupying claimant for the land.  Of course, it is inoperative, since the plaintiff's right of election has been taken away.  It is argued

that the court could not in this case make such a decree. We go further, and say that the court could not in any case make such decree. The only remedy under the occupying-claimant act, as it now stands, is the payment by the plaintiff of the value of the improvements. No forced sale of the land can be made. It follows, therefore, that it is entirely immaterial whether the land in question is alienable or not.

The opinion of the court was delivered by

HORTON, C. J.: This was an action of ejectment, brought by the plaintiff in error, who was also plaintiff in the court below, to recover the possession of the west half of the northeast quarter of section 34, in township 10, of range 13, situate in Shawnee county. The second trial of the case was had by the court, without the intervention of a jury, and the court found as conclusions of fact, as follows:

1st.—The plaintiff's maiden name was Susan Latranch. At the commencement of this action, plaintiff was a married woman, and of the age of eighteen years.

2d.—Under and in conformity with the second article of the treaty of November 15th 1861, between the United States and the Pottawatomie tribe of Indians, (proclaimed 19th April 1862,) the agent of said tribe took a census of the members of the tribe, classifying them in separate lists, showing the names, ages, and numbers of those desiring lands in severalty, and of those desiring lands in common, designating chiefs, and headmen, respectively. Said census, classification, and list showed that Susan Latranch, (now Susan Maynes, plaintiff,) then a minor, was a member of the tribe desiring lands in severalty, as chosen for her by Anthony F. Navarre, who was the head of the family of which said Susan was a member.

3d.—Thereupon there was assigned, under the direction of the Commissioner of Indian Affairs, to said Susan Latranch the land in controversy in this action, being eighty acres then and before that time a portion of the Pottawatomie Indian Reservation, and situate in the county of Shawnee, and described as follows: The west half of the northeast quarter of section 34, in township 10 south, of range 13 east of the sixth principal meridian in Kansas.

4th.—After such assignment was completed, and on the 12th

of April 1866, a certificate was issued by the then Commissioner of Indian Affairs, to the said Susan Latranch in words and figures as follows:

#### INDIAN LAND CERTIFICATE.

TO ALL WHOM IT MAY CONCERN: It is hereby certified, that Susan Latranch, a member of the Pottawatomie tribe of Indians, is entitled to eighty acres of land, under the provisions of the treaty of said Indians with the United States concluded on the fifteenth day of November 1861; and, being so entitled —

It is further certified, that, in pursuance of said treaty, there has been assigned to the said Susan Latranch, the west half of the northeast quarter of section thirty-four, in township ten south, of range thirteen east of the sixth principal meridian in Kansas.

It is also certified, that the said Susan Latranch and her heirs are entitled to the immediate and exclusive possession and use of said land.

It is further certified, that this certificate is not transferable; and that any sale, lease, transfer, or incumbrance of the said land, or any part thereof, to any person or persons whomsoever, except it be to the United States, or to members of said tribe of Indian blood, with the consent of the President, and under such rules and regulations as may be prescribed by the Secretary of the Interior, or except upon the terms and in the manner provided by said treaty, is, and will continue to be, utterly void and of no effect.

It is further certified, that the said land is exempt from levy, taxation, sale, or forfeiture, until otherwise provided by congress.

In testimony whereof, I, Dennis N. Cooley, Commissioner of Indian Affairs, have hereunto set my hand, and caused the seal of the Department of the Interior to be hereto attached, at the city of Washington, this twelfth day of April 1866.

[SEAL.]                                     D. N. COOLEY, *Commissioner.*

5th.—Said defendants were in possession of said land before the commencement of this action, and were in possession thereof at the commencement of this action, and withheld the same from the possession of the plaintiff, and kept her the said plaintiff out of the possession thereof.

6th.—On the 16th of May 1870, under the supposed power and authority conferred by the sixth section of the treaty of 27th February 1867, which, as amended 4th August 1868, was ratified and proclaimed 7th August 1868, a patent was issued to Anthony F. Navarre, as the head of the family of which said Susan Latranch (now Susan Maynes) was a member, for the land in controversy, which patent is in words and figures as follows:

THE UNITED STATES OF AMERICA. *To all to Whom these Presents shall Come, Greeting:* Whereas, there has been deposited in the General Land Office an official return, certified under date of March 7th 1870, by the Commissioner of Indian Affairs, accompanied by List No. 1, "containing the names, age, and sex of persons, *Pottawatomie Indians,* belonging to families the heads of which have become citizens of the United States, or have applied to become citizens under treaty provisions, with description of the lands allotted to said persons; the issue of patents for said lands, and the

payment of *pro rata* share of the moneys and credits of the tribe, belonging to said persons, it is desired to have made, in accordance with the provisions of the sixth article of the treaty of February 27th 1867, and the act of congress approved April 10th 1869."

And whereas, the said list is accompanied by the order, dated March 1st 1870, of the President, for the issuing of patents, for the tracts therein described, the said list designating Saw-na-ne-qua as allottee of allotment No. 598, being the lot numbered two, of section eight, in township eleven south, of range thirteen east, and the southeast quarter of the northwest quarter of section thirty-four, in township ten south, of range thirteen east, containing eighty-one acres and fifty-three one-hundredths of an acre, reserving from the described allotment the Government shops and buildings, and the use of five acres of ground for agency purposes; and Susan Latranch, as an allottee of allotment No. 600, being the west half of the northeast quarter of section thirty-four, in township ten south, of range thirteen east, containing eighty acres, said tracts being east of the sixth principal meridian, and situated in the district of lands subject to sale at Topeka, Kansas, and the said list designating Anthony F. Navarre as the head of the family of said allottees to whom the patents for said allotment shall issue.

Now, know ye, that the United States of America, in consideration of the premises, and pursuant to the treaties, act of congress, and President's order aforesaid, have given and granted, and by these presents do give and grant, unto the said Anthony F. Navarre, and to his heirs, the tracts of land above described; to have and to hold the said tracts or parcels, with the appurtenances, unto the said Anthony F. Navarre, and to his heirs and assigns forever.

*In testimony whereof,* I, Ulysses S. Grant, President of the United States, have caused these letters to be made patent, and the seal of the General Land Office to be hereunto affixed.

Given under my hand, at the City of Washington, this sixteenth day of May, in the year of our Lord one thousand eight hundred and [SEAL.] seventy, and of the Independence of the United States the ninety-fourth.

By the President:                                        U. S. GRANT,
                                                  *By Charles White, Secretary.*
J. N. Granger, Recorder of the General Land Office.
Recorded, Pottawatomies, Treaty of 1867, vol. 1, page 116.

7th.—All of the said defendants in this action claim title by deed through said Anthony F. Navarre.

And the court finds as conclusions of law:

1st.—Said treaty of November 15th 1861, and the action had thereunder, including the issuance of the said certificate by the Commissioner of Indian Affairs, operated as and constituted a grant of the land in controversy to said Susan Latranch, (now Susan Maynes, plaintiff.)

2d.—Said treaty of 15th February 1867 did not authorize the issuance of the patent to said Anthony F. Navarre.

3d.—Said patent so issued on the 16th of May 1870, to said Anthony F. Navarre, is null and void.

4th.—The plaintiff, at the time of the commencement of this action was, and now is, the owner of said land and premises

in her petition described, and entitled to the immediate and exclusive possession thereof.

It is therefore considered, ordered, and adjudged, that the said Susan Maynes, plaintiff, do recover against the said defendants the premises in her said petition described, and also her costs in and about her suit in this behalf expended.

Judgment of eviction having been thus rendered against the defendants, they invoked the benefits of the occupying-claimant act. The district court held that the defendants were entitled thereto, and "ordered that further proceedings be had in the premises agreeably" to said act. The plaintiff excepted to this order, and now in this court assigns said order as error.

As no cross-petition has been filed, and no effort made to question the correctness of the judgment rendered in favor of the plaintiff, except in the brief of the defendants in error, (and there only indirectly,) we must treat such judgment as final, and satisfactory to all the parties; and the conclusion follows, that we cannot review, in this action, the decision of the district court as to the allotment and grant of land to the plaintiff under the provisions of the Pottawatomie treaty of 1862, nor the question of the validity of the patent issued to Anthony F. Navarre under the treaty of 1868. (*Waterson v. Devoe*, 18 Kas. 223.) Assuming then, that in accordance with the ruling of the district court, the patent to Navarre, of 16th May 1870, was absolutely void, and that the plaintiff is the owner of the premises under the treaty of 1862 and the certificate issued by the Commissioner of Indian Affairs on 12th April 1866, the question presented is, whether the defendants are entitled to any of the benefits of the occupying-claimant act?

The said certificate of April 12th provides, that it "is not transferable, and that any sale, lease, transfer, or incumbrance of the said land, or any part thereof, to any person or persons whomsoever, except it be to the United States, or to members of said tribe of Indian blood, with consent of the president, and under such rules and regulations as may be

prescribed by the Secretary of the Interior, or except upon the terms and in the manner provided by said treaty, is, and will continue to be, utterly void and of no effect." This certificate was based upon that provision of the treaty which states, "when such assignments shall have been completed, certificates shall be issued by the Commissioner of Indian Affairs for the tracts assigned in severalty, specifying the names of the individuals to whom they have been assigned respectively, and that said tracts are set apart for the purpose and exclusive use and benefit of such assignees and their heirs. Until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee, or leased, or otherwise disposed of, only to the United States, or to persons then being members of the Pottawatomie tribe and of Indian blood, and under such regulations as the Secretary of the Interior shall provide, except as may be hereinafter provided." To relieve themselves from the effect of these conditions, the defendants assert that the restrictions upon the plaintiff's right of alienation were afterward removed; that by article 3 of the treaty of 1862, such restrictions to adults, being males and heads of families, were removable upon certain conditions; that in 1866, by a supplemental article, this privilege was extended to all adults of the tribe, without distinction of sex, whether the person was the head of a family, or not; that by the treaty of 1868, when any member of the tribe should become a citizen, under the provisions of the treaty of 1862, the families of said parties should be considered as citizens; and that as a patent in this instance was issued to Anthony F. Navarre, the head of the family of which the plaintiff was a member, the plaintiff thereby became a citizen, and her land alienable, taxable, etc., as the property of other citizens. But the defendants are crippled at once in their claim, because, upon this record, it is conceded by all parties, that the patent issued to Navarre was void. As no other evidence was introduced upon the application of the occupying claimants than the findings of fact of the court, the citizenship of the head of the family is not at-

tempted to be established except by the recitals of a patent
issued without any authority of law.    Waiving the question
of what may or may not be proven by the recitals of a void
patent, and anticipating this testimony may be supplied on a
new hearing, it seems to us evident that it was not the inten-
tion by the several provisions of the treaties of 1862, 1866,
and 1868, to have the lands of allottees, situated as the plain-
tiff was at the date of such patent, subject to levy, taxation
and sale by the mere act of a member of the same family
becoming a citizen. (Art. 2 and 3, treaty 1862, 12 Stat. at
Large, 1191; art. 1, treaty 1866, 14 Stat. at Large, 763; art.
6, treaty 1868, 15 Stat. at Large, 531.)    There is nothing in
the powers conferred by citizenship, independent of the treaty,
which of themselves release the restrictions on alienation;
and if these restrictions are discharged, when the allottees
become citizens, such discharge or release must be found in
some one of these treaties.    Article 4 of the treaty of 1868
provides that the provisions of article 3 of the treaty of 1862,
relative to Pottawatomies who desire to become citizens, shall
continue in force; and sections 2 and 3 of the treaty of 1862,
the supplemental article of 1866, and section 6 of the treaty
of 1867, must be construed and reconciled together, if possi-
ble; and thus construed, the power of alienation is withheld
from the allottee, until she, being an adult, shall have satis-
fied the president that she is sufficiently intelligent and pru-
dent to control her affairs and interests, and until the president,
at her request, shall cause the land to be conveyed to her by
patent, "and *thereafter* the land so patented to her shall be
subject to levy, taxation, and sale, in like manner with the
property of other citizens."    No patent to her has yet been
issued, and none applied for.    The void patent to Navarre
cannot be counted.    Admitting that Navarre became a citi-
zen, and thereby the plaintiff, a member of his family, became
a citizen also, neither of these acts relieved or emancipated
the land of the plaintiff from the restrictions on its alienation
as provided in the treaty of 1862; the title to the same, for
aught that appears in this record, is still inalienable.

With this conclusion obtained, the defendants have no right to the benefit of the occupying-claimant act. It is immaterial whether section 610 of the civil code permits the successful claimant to elect to receive the value of the land without improvements, upon tendering a general warranty deed, or whether section 608, as amended by sec. 2 of ch. 102, Laws of 1873, requires the payment by the claimant of the value of the improvements; because, in either view, the enforcement of these provisions, or either of them, would in effect defeat the operation of the treaty of 1862, and violate a paramount federal law. A continued hostile possession would virtually deny title to the plaintiff; and a temporary hostile possession would embarrass the exercise of that title. In a conflict between the law of the state, and a treaty of the United States in regard to Indian lands in the state, the former must give way. Neither the title, nor possession of the Indian owner, secured by treaty with the United States government, can be disturbed by state legislation; and the occupying-claimant act has no application in this case. *Krause v. Means*, 12 Kas. 335; *The Kansas Indians*, 5 Wall. 737; *Farrington v. Wilson*, 29 Wis. 383.

The order of the district court granting to the defendants the benefit of the occupying-claimant act will be reversed, and the case remanded.

All the Justices concurring.