BRIGGS *et al.* v. SAMPLE *et al.*

(*Circuit Court, D. Kansas.* July 24, 1890.)

1. DEED—VALIDITY—INDIAN TITLE.

    The treaty with the Kickapoo Indians (13 U. S. St. 624) provided that the land allotted to the Indians could not be sold to white men without permission of the president, which permission should be signified by his causing the land to be patented to the Indians "with power of alienation," and that before receiving patent the Indians must appear before the district court, make proof of their intelligence and ability, and take the oath of allegiance. An Indian conveyed his land by warranty deed on the day he made such proof, and after he had obtained his patent conveyed the land to another grantee. *Held,* that the second grantee took the land, since the first deed, being made before patent, was ineffectual to convey the land, either directly or by estoppel.

2. SAME—RECORDING—NOTICE.

    The recording of the first deed before the patent was granted constituted no notice to the second grantee.

In Equity.

*H. M. Jackson,* for plaintiff.

*A. F. Martin,* for defendants.

FOSTER, J. The complainants file their bill in equity to quiet title to 40 acres of land in Atchison county, Kan., alleging title and possession in themselves, and further alleging that the action involves a construction of a treaty of the United States with the Kickapoo tribe of Indians, and that the defendants set up some claim to said property which constitutes a cloud upon complainants' title, and pray to have the title quieted, and for an injunction against defendants from interfering with complainants' possession. The facts are briefly these: The land was allotted to Meshem-a-wa, (Peter Cadue,) a Kickapoo Indian, under the treaty with such tribe proclaimed May 28, 1863. 13 U. S. St. 624. On October 20, 1886, said Indian appeared before the United States district court, and made proof as contemplated by the third article of said treaty, and took the oath of allegiance therein provided for. On the 24th day of December, 1887, the president of the United States directed a patent to issue to said allottee, and on the 19th day of January, 1888, said patent was issued, and delivered to the patentee; and on the 25th day of January, said patentee conveyed the land by warranty deed to these complainants. The source of the defendants' title is a warranty deed executed and delivered by said allottee to W. C. Cole and A. F. Martin on the 20th day of October, 1886, being the same day he made his proof before the United States court, but long before the patent was issued, and before the presi-

dent ordered it to be issued. This deed was recorded in the office of the register of deeds of Atchison county on the same day it was executed. All of these grantees are white men, and in no way connected with the Kickapoo tribe of Indians, and, it appears from the evidence, complainants are in possession. The question to be determined under this state of facts is this: Which of these grantees has the legal title to said land? Article 2 of said Kickapoo treaty has this provision relating to allotments in severalty:

"Until otherwise provided by law, such tracts shall be exempt from levy, taxation, or sale, and shall be alienable in fee, or leased, or otherwise disposed of, only to the United States, or to persons then being members of the Kickapoo tribe, and of Indian blood, with the permission of the president, and under such rules and regulations as the secretary of the interior shall provide, except as may be hereinafter provided."

Article 3 of said treaty is as follows:

"At any time hereafter, when the president of the United States shall have become satisfied that any adults, being males and heads of families, who may be allottees under the provision of the foregoing article, are sufficiently intelligent and prudent to control their affairs and interests, he may, at the request of such persons, cause the land severally held by them to be conveyed to them by patent, in fee-simple, with power of alienation, and may at the same time cause to be set apart, and placed to their credit severally, their proportion of the cash value of the credits of the tribe, principal and interest, then held in trust by the United States, and also, as the same may be received, their proportion of the proceeds of the sale of lands under the provisions of this treaty; and such patents being issued, and such payments ordered to be made by the president, such competent persons shall cease to be members of said tribe, and shall become citizens of the United States; and thereafter the lands so patented to them shall be subject to levy, taxation, and sale, in like manner with the property of other citizens: provided that, before making any such application to the president, they shall appear in open court, in the district court of the United States for the district of Kansas, and make the same proof, and take the same oath of allegiance, as is provided by law for the naturalization of aliens, and shall also make proof, to the satisfaction of said court, that they are sufficiently intelligent and prudent to control their affairs and interests; that they have adopted the habits of civilized life, and have been able to support, for at least five years, themselves and families."

It will be observed that, under the provisions of article 2 of said treaty, this land could not be sold to any person other than a member of the Kickapoo tribe without the permission of the president of the United States. Article 3 provides the mode by which the president shall act in giving his permission to the allottee to alienate his land. Being satisfied of the intelligence and prudence of the Indian to control his own affairs and interests, the president may cause the land to be conveyed to him "by patent in fee-simple, with power of alienation; * * * and such patents being issued, and such payments ordered to be made by the president, such persons shall cease to be members of said tribe, and shall become citizens of the United States, and thereafter the lands so patented to them shall be subject to levy, taxation, and sale in like manner with the property of other citizens." The article further provides that before making application to the president the Indian shall appear before

the United States district court, and make certain proofs establishing his intelligence, ability to support himself and family, etc., and take the oath of allegiance. This proof and oath of allegiance before the court does not of itself make the Indian a citizen, or sever his tribal relations, or procure him his patent, or make his land alienable. It is simply a preliminary proceeding to his making application to the president, and thereafter the president may act in the matter; and not until his patent is issued, and payments of his interest in the trust fund have been ordered, does he cease to be a member of the tribe, and become a citizen, and possess the power to alienate his land. It is clear that at the time this allottee made his deed to Cole and Martin, October 20, 1886, he was not a citizen, but still held his tribal relations, and was incompetent to contract, or to be contracted with, for the sale of his land; and his deed to said parties was illegal and void. Under the plain words of the treaty, it would seem no citation of cases is necessary; but, touching on this subject, see the following cases: *Pennock* v. *Monroe*, 5 Kan. 584; *Libby* v. *Clark*, 118 U. S. 250, 6 Sup. Ct. Rep. 1045; *Smith* v. *Stevens*, 10 Wall. 327; *Sheldon* v. *Donohoe*, 40 Kan. 346, 19 Pac. Rep. 901; *Maynes* v. *Veale*, 20 Kan. 374.

The defendants, however, insist that the title afterwards acquired by the allottee by the issuing of patent accrued by operation of law to his first grantees, under the covenants of warranty, and that he and his subsequent grantees are estopped to set up the subsequently acquired title. This position is not tenable. A void deed with covenants of warranty does not convey an after-acquired title. The grantor was incompetent, and under disability, to make the contract. The conveyance was in violation of law, and he may repudiate his act; but, if he invokes the aid of a court of equity, he must do equity. The question remains, can the patentee or his grantees, with knowledge of the former conveyance, invoke the aid of this court to quiet title against that conveyance, and at the same time hold the proceeds of that sale? On this question, either party may cite authorities within 20 days, and in the mean time no decree will be entered.

On further consideration of the complainants' liability to refund the purchase money paid by Cole and Martin, the complainants make the point that they are *bona fide* purchasers without notice, and therefore took the land free of such equity. On looking into the testimony, I find that both complainants testify that they had no actual notice of the prior sale by their grantor, and their testimony is not contradicted. The possession of Samuels appeared to be substantially the same both before and after the sale, and the record of the deed to Cole and Martin did not impute notice to the complainants; for they were not bound to look further back than the date of the patent, as their grantor's power to sell had its inception with the issue of the patent, and not before. The complainants are entitled to their decree.